# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Shirley Yeo Llizo, V.M.D.,**

        **Plaintiff,**

**v.**                                                                 **Case No. 11-2302-JWL**

**City of Topeka, Kansas,**

        **Defendant.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff filed this lawsuit against the City of Topeka after the City terminated her employment. Plaintiff alleges that the City discriminated against her by terminating her employment on the basis of her national origin, ancestry, color, race and/or sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e et seq. and the Kansas Act Against Discrimination, K.S.A. § 44-1001 et seq. She also asserts that the City discriminated against her by terminating her employment on the basis of her national origin, ancestry, color and/or race in violation of 42 U.S.C. §§ 1981 and 1983. This matter is presently before the court on defendant's motion for summary judgment (doc. 118).[1] As explained below, the motion is granted with respect to plaintiff's §§ 1981 and 1983 claims on the grounds that plaintiff has not established a genuine dispute of material fact about whether the City had a custom of discriminatory employment practices. The motion is otherwise denied.

---

[1]In the pretrial order, plaintiff also alleges that the City denied her grievance challenging the discharge decision on the basis of her national origin, ancestry, color, race and/or sex. Defendant does not address these claims in its motion for summary judgment.

## I.      Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the non-moving party.  Plaintiff Shirley Yeo Llizo is a non-Caucasian female of Chinese ancestry born in the Republic of Singapore.  She is a naturalized citizen of the United States and a veterinarian licensed to practice in Kansas.  In January 2006, plaintiff began her employment with the City of Topeka as the Zoo Veterinarian at the City of Topeka Zoo.  At all time relevant to this dispute, plaintiff's immediate supervisor, and the individual who made the decision to hire plaintiff, was Michael Coker, the Zoo Director.   The first three and one-half years of plaintiff's employment passed without incident.

On August 12, 2009, the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") conducted a routine inspection of the Topeka Zoo. The USDA-APHIS is responsible for inspecting licensed facilities in order to monitor compliance with the Animal Welfare Act ("AWA") and its regulations and standards.  Facilities such as the Topeka Zoo are expected to meet or exceed the regulations and standards of the AWA at all times.  The USDA has the authority to impose fines on a zoo and in some cases can temporarily or permanently revoke a zoo's license depending on the number, frequency and severity of any incidents of noncompliance.  The August 2009 USDA-APHIS inspection was conducted by two inspectors, Dr. Katheryn Ziegerer and Dr. Michael Tygert.  Plaintiff and two other Zoo employees, Merle Miller and Fawn Moser, accompanied Drs. Ziegerer and Tygert during the inspection.

The USDA-APHIS cited the Topeka Zoo for a number of violations it found during the

August 12, 2009 inspection.  Pertinent to plaintiff's discharge, the inspection report cited the City for the presence of expired medications in the Zoo's pharmacy.  Specifically, the report identified three vials of medications that had expired and the Zoo was cautioned to correct the violation.  This issue was identified as an "attending veterinarian" issue and plaintiff accepts responsibility for retention of the expired medications.  The inspection report cites numerous other problems at the Zoo, none of which the City relies on for its discharge decision, including the arguably preventable deaths of four Zoo animals; waste disposal issues; and pest control issues.

On September 9, 2009, Mr. Coker and Assistant City Attorney Eric Smith met with Dr. Ziegerer and Dr. Tanya Tims, another USDA-APHIS inspector, to discuss the August 2009 inspection and specific concerns about the facility.  According to Mr. Coker and Mr. Smith, one of the inspectors told them during this meeting that she believed that plaintiff lacked compassion for the well-being of the Zoo animals.  Mr. Coker avers that he was concerned that the inspectors had that opinion of the Zoo's veterinarian.  During this meeting, one of the inspectors allegedly advised Mr. Coker that the inspectors had found an additional 20 to 30 expired drugs and medications at the Zoo.

On September 28, 2009, Drs. Zeigerer and Tims conducted another inspection of the Zoo. In connection with this inspection, the inspectors requested medical records on numerous specific animals.  Plaintiff was tasked with providing the records to the inspectors and there was a considerable delay in submitting the records to the USDA.  According to the City, this delay created the impression with the USDA that the City was manufacturing records to satisfy the

request for records and put the City in a "bad light" with the USDA.  Although the USDA-APHIS cited the Topeka Zoo for a number of violations it found during the September 28, 2009 inspection, including the arguably preventable deaths of animals, the City does not contend that any issues stemming from the September inspection–aside from the medical records delay–resulted in plaintiff's discharge.

According to Mr. Coker, he came to the conclusion following the August and September 2009 inspections that the Zoo did not have the right veterinarian running the veterinary program and that a change needed to be made.  At the end of October 2009, Mr. Coker terminated plaintiff's employment.  The Notice of Discharge issued to plaintiff by Mr. Coker identified numerous reasons for her discharge, including the retention of expired medications; lying to the USDA that the City retained expired medications to "save budget"; demonstrating a lack of professional courtesy to the USDA officials during the inspection; and the delay in providing complete medical records to the USDA.[2]

Plaintiff subsequently grieved the discharge decision and the matter was submitted to arbitration.  The sole issue for resolution at the arbitration was whether "just cause" existed for plaintiff's discharge.  In July 2010, plaintiff's employment was reinstated as a result of that arbitration and plaintiff remains employed today as the veterinarian at the Topeka Zoo.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

_____

[2]The Notice of Discharge also relies on an incident concerning a Bornean orangutan, but the City has withdrawn that basis for plaintiff's discharge and no longer relies upon it.

4

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In applying this standard, the court views the evidence and make inferences in the light most favorable to the non-movant.  *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.  *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, "the nonmoving party must present more than a scintilla of evidence in favor of his position." *Id*. (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177–78 (10th Cir. 2008)).

## III.    Discrimination Claims

Plaintiff contends that defendant terminated her employment on the basis of her national origin, ancestry, color, race and/or sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§  2000e et seq. and the Kansas Act Against Discrimination, K.S.A. § 44-1001 et seq. She also asserts claims of race discrimination under 42 U.S.C. § 1981.  As plaintiff has no direct evidence of discrimination, her claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Khalik v. United Air*

5

*Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).[3]   Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.* (citing *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002)).  To set forth a prima facie case of discrimination, a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class.  *Id.* (citing *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998).[4] If she establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citing *Garrett*, 305 F.3d at 1216).  If defendant meets this burden, summary judgment against plaintiff is warranted unless she shows that her protected status was a determinative factor in the employment decision or that the defendant's reasons are pretextual. *Id.*

In its motion for summary judgment, defendant first contends that plaintiff cannot establish a prima facie case of discrimination because she cannot show that she was qualified for the veterinarian position in light of her unsatisfactory work performance.  As evidence of her

---

[3]The court applies the same standards and burdens to plaintiff's § 1981, § 1983 and KAAD claims as it applies to plaintiff's Title VII claims. *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n.3 (10th Cir. 1997).

[4]The fourth prong of the prima facie test is a flexible one that "can be satisfied differently in varying scenarios." *Swackhammer .v Sprint/United Management Co.*, 493 F.3d 1160, 1166 n.8 (10th Cir. 2007).  Because defendant here does not challenge the fourth prong, the court need not concern itself with the appropriate formulation of that prong.

alleged poor performance, defendant relies on its asserted reasons for plaintiff's discharge. Defendant, then, urges the court to consider its proffered nondiscriminatory reasons for terminating plaintiff's employment in connection with analyzing plaintiff's prima facie case. Stated another way, defendant suggests that plaintiff must disprove defendant's proffered reasons for the termination decision in order to establish her prima facie case. This argument constitutes an impermissible "end run" around the *McDonnell Douglas* analysis and the court cannot consider it at the prima facie stage. *See, e.g., EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192–94 (10th Cir. 2000) (requiring plaintiff to disprove defendant's proffered reason for employment decision to establish prima facie case would inappropriately short circuit *McDonnell Douglas* analysis and frustrate plaintiff's ability to establish pretext).

Because defendant does not otherwise challenge plaintiff's prima facie case, the court turns to analyze whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for the termination decision. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here. *See id.*

Defendant asserts that it terminated plaintiff's employment based on concerns relating to the August 2009 and September 2009 USDA inspections as set forth in the Notice of Discharge, including plaintiff's maintaining expired medications (both the vials identified in the USDA report and the additional medications allegedly identified by the inspectors in a conversation

7

with Mr. Coker subsequent to the August 2009 inspection); plaintiff's "false statement" to the USDA inspectors during the August 2009 inspection concerning budget constraints; plaintiff's lack of professional courtesy during the August 2009 inspection; and plaintiff's failure to provide complete medical records in a timely fashion for the September 2009 inspection. Defendant also contends that one of the inspectors advised Mr. Coker that plaintiff "lacked compassion for animals." Based on all of these concerns, according to defendant, Mr. Coker determined that the Zoo did not have the right veterinarian running the veterinarian program and a change needed to be made. The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reasons are pretextual.

Before turning to plaintiff's pretext evidence, the court addresses defendant's contention that it is entitled to an inference that no discriminatory animus motivated the termination decision in this case because the "same actor" hired and fired plaintiff within a relatively short time span. The "same actor inference" is based on the notion that it "makes little sense to deduce" that an individual who hires a person–fully aware of that person's race or national origin or other protected characteristic–would then fire that person a short time later based on that characteristic. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). In *Antonio*, the Tenth Circuit recognized that "in cases where the employee was hired and fired by the same person within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Id.* (internal quotations omitted).

The court declines to apply the inference in this case. Mr. Coker hired plaintiff in January

2006 and her employment was terminated in October 2009–nearly 4 years after her start date. The court doubts whether this four-year span constitutes a "relatively short time span" as contemplated by the Tenth Circuit in *Antonio*. While the Circuit acknowledged that the temporal separation between hiring and firing "has varied widely" among cases applying the inference, five of the six cases cited by the Circuit in support of that observation applied the inference to time spans of one year or less (and the Circuit in Antonio applied the inference to a 10-month span) and the only case recognizing the inference beyond the one-year mark is a Fifth Circuit case applying the inference to a four-year span. *See id.* at 1183 n.4. The Fifth Circuit appears to represent the minority view on this issue and the Tenth Circuit has not endorsed the Fifth Circuit approach. In the absence of further guidance from the Circuit on this issue, the court declines to apply the same actor inference when four years has elapsed between the hiring and firing decisions. *See Quinby v. WestLB AG*, 2007 WL 1153994, at *8 (S.D.N.Y. Apr. 19, 2007) (same actor inference is "extinguished" by four years that passed between hiring and firing); *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) (finding same actor inference inapplicable where over three years elapsed between plaintiff's hiring and firing).

Moreover, even if the court were inclined to apply the inference in this case, that inference is at least weakened by the significant length of time between the hiring and firing decisions because it is feasible that the decisionmaker may develop an animus toward a class of people that did not exist when the hiring decision was made. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000) (same actor inference less compelling when a significant period of time elapses between hiring and firing); *Rosales v. Career Sys. Dev. Corp.*, 2009 WL

3644867, at *13 (E.D. Cal. 2009) (four-year span between hiring and firing weakens "potency" of inference).  In any event, as explained below, plaintiff has produced evidence of pretext sufficient to dispel whatever inference arises from the fact that Mr. Coker hired plaintiff and then fired her four years later.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011).  In essence, a plaintiff shows pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *McDonald-Cuba v. Santa Fe Protective Servs., Inc.*, 644 F.3d 1096, 1102 (10th Cir. 2011).

Before turning to plaintiff's pretext evidence regarding the City's proffered reasons for terminating plaintiff's employment, the court examines the evidence regarding a significant issue that the City does not mention in connection with plaintiff's discharge–the arguably preventable animal deaths that occurred at the Zoo during the relevant time period.  The USDA's August

2009 inspection report addresses in detail the deaths of 4 animals–a leopard; an adult hippopotamus; a tamandua; and a lion cub.  There is evidence in the record that the USDA inspectors perceived these animal deaths as the "most troubling" of the non-compliance items identified in the report, yet defendant did not discipline any employee–including plaintiff–for any of these deaths.

The inspection report suggests that the hippopotamus died "despite administration of veterinary care" in part because the zookeepers failed to routinely monitor the temperature of the pool, which was detrimental to the animal's health.  No zoo keeper was disciplined in any way as a result of the hippo's death.  The tamandua apparently died in part because the zookeepers failed to observe the animal for an extended period of time and did not convey information concerning the health of the animal to plaintiff.  No employee was disciplined over the death of this animal.  A lion cub died after falling off a three-foot-six-inch shelf in its housing facility and landing on the concrete floor.  Again, despite the concerns of the inspectors about the number of animal deaths at the facility, no one was disciplined for this death.  With respect to the leopard, the inspection report suggests that this death resulted from a lack of adequate veterinary care.  Of the four animal deaths, the leopard death appears to be the only death for which the USDA arguably held plaintiff responsible.  While plaintiff has ample evidence challenging this conclusion, the City did not discipline plaintiff for this death in any event and it does not appear anywhere in the Notice of Discharge.  Presumably, if defendant was truly concerned about the inspectors' perception of the facility (as it claims it was), then defendant would have taken corrective action with respect to the most serious issues identified by the

inspectors–the deaths of numerous animals at the facility.

The USDA September 2009 inspection report identifies additional animal deaths as key areas of concern, including the death of a Pallas cat; a rabbit; a pronghorn and a chevrotain.[5] In early October 2009, Mr. Coker drafted his comments regarding plaintiff's performance in preparation for her termination.   This draft relies on the deaths of each these four animals (the cat, rabbit, pronghorn and chevrotain) as a reason supporting plaintiff's termination.  Less than 3 weeks later, however, defendant issued the Notice of Discharge with no mention of these animals deaths.  This, too, suggests that defendant's proffered reasons are unworthy of belief. *See Crowe*, 649 F.3d at 1197 (pretext can be shown by evidence of defendant's shifting rationales for discharge decision); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) (changing explanations can show that the employer is attempting to mask an illegitimate motive).

The court turns back, then, to the specific reasons proffered by the City for plaintiff's discharge.  As noted earlier, defendant asserts that it terminated plaintiff's employment based on concerns relating to the August 2009 and September 2009 USDA inspections.  In the Notice of Discharge, Mr. Coker first highlighted the expired medications discovered by the USDA inspectors, including two vials identified in the inspection report and "over 20" additional expired medications allegedly identified by the inspectors in a conversation with Mr. Coker on

---

[5]The court does not suggest that these animals died in the period between the August 2009 and September 2009 inspections.  The court presumes that information concerning these deaths surfaced during the medical records review conducted by the USDA.

September 9, 2009.  Plaintiff's evidence demonstrates that the City's decision to discharge her

for maintaining expired medications is inconsistent with a written Zoo policy that expressly

permits the retention of expired medications.  That policy, in pertinent part, states that

> Some expired drugs may be saved at the Veterinarian's discretion, drugs that are
> difficult to obtain, backordered, no longer manufactured or other reasons.  These
> drugs will be kept separate from the current drugs, and will have a sticker attached
> to them reading "expired drug, use accordingly."

While defendant contends that plaintiff violated the policy because the expired drugs discovered

by the USDA did not have the "expired drug, use accordingly" stickers affixed to them, it is

undisputed that defendant did not discharge plaintiff for retaining expired drugs without using

the appropriate stickers; it discharged plaintiff for retaining the expired drugs at all.  Because the

City's own policy permits the retention of expired drugs, plaintiff has sufficiently called into

question this asserted reason for her discharge.  *See Kendrick v. Penske Transp. Servs., Inc.*, 220

F.3d 1220, 1230 (10th Cir. 2000) (plaintiff may show pretext with evidence that the defendant

acted contrary to a written policy when making the adverse employment decision affecting the

plaintiff).

Moreover, there is other evidence from which a jury could reasonably conclude that the

City was not concerned about the retention of expired medications in the Zoo pharmacy.  From

2001 through 2005, Dr. Cornelia Ketz-Riley, an employee at that time of Kansas State

University, provided veterinary services to the City at the Topeka Zoo on a contract basis.

According to Dr. Ketz-Riley's testimony, USDA inspectors discovered expired medications in

the Zoo pharmacy in both 2002 and 2004 and yet the City did not terminate the contract with

Kansas State University or seek to have Dr. Ketz-Riley replaced in any way.  It is undisputed that Mr. Coker had knowledge of the expired medications retained by Dr. Ketz-Riley.  In 2005, the City asked Dr. Ketz-Riley to become a City employee and to remain as the Zoo's veterinarian in that capacity.  Dr. Ketz-Riley declined the offer.  While the court appreciates that Dr. Ketz-Riley is not a "similarly situated employee" because she was not employed by the City, this evidence nonetheless tends to show that the retention of expired medications was not truly a concern to the City, particularly when viewed in the context of the City's policy permitting such retention.

Defendant also contends in the Notice of Discharge that plaintiff, during the September 2009 USDA inspection, failed to provide complete medical records for review by USDA officials in a timely manner.  Defendant asserts that plaintiff lacked "due diligence" and that her delay put the Zoo in a "bad light," by creating the impression that she was manufacturing records to satisfy the inspectors' requests.  Viewed in the light most favorable to plaintiff, the evidence demonstrates that this reason is disingenuous.  The City's electronic medical records system, MedARKS,[6] crashed in June 2009 and it is undisputed that the City lost two years' worth of veterinary medical records as a result of that crash, coupled with the City's inadvertent failure to back up data entries.  No data was recoverable after the system crashed and Zoo employees, including plaintiff, were charged with manually re-entering into the system two years' worth of paper records.  This manual re-entry was not completed at the time the USDA conducted its

_____

[6]MedARKS, or Medical Animal Record Keeping Systems, is an electronic database containing animal inventory, clinical notes, clinical pathology and related information.

14

inspections in August and September 2009 and manual re-entry was continuing even into 2012.

Because the majority of electronic records were missing, plaintiff could not respond to the inspectors' requests for records by simply going to the computer and printing the requested records. Rather, she was required to comb through voluminous paper records to gather the specific information sought regarding each animal about which the USDA requested medical records. Significantly, plaintiff could not simply submit paper records to the inspectors, as those records were not separated by specific animal but were compiled on a daily basis such that they contained notations on a variety of animals and issues. The inspectors had requested records on a "per animal" basis such as those maintained by the MedARKS system. The time delay, then, was caused not by plaintiff's lack of diligence or any attempt to recreate history, but by plaintiff's attempts to gather the information in light of what the City admitted was a "catastrophic" system failure.

The evidence further reflects that Mr. Coker was well aware of the MedARKS system failure and its affect on records retrieval at the time he criticized plaintiff for her delay in providing records to the USDA inspectors. Moreover, in a late September 2009 e-mail to Mr. Smith, Mr. Coker discusses the records delay and does not blame that delay on plaintiff in any respect. He tells Mr. Smith that plaintiff "was a little slow getting the USDA medical files as requested. USDA provided a list of files they wanted to review; it took a little time and requesting more complete information on my part from Dr. Llizo for USDA to review." The fact that the records issue, without explanation, somehow escalated from a non-issue to a primary reason for plaintiff's discharge is sufficient to create a genuine dispute about the veracity of that

reason.  This is particularly true when coupled with the fact that the City knew about the MedARKS system failure and the affect of that failure on the ability to retrieve records and yet failed to account for that issue in the Notice of Discharge.

According to defendant, Mr. Coker also decided to terminate plaintiff's employment because one of the USDA inspectors expressed to him that plaintiff "lacked compassion for animals" and Mr. Coker was concerned that the inspectors had that opinion of the Zoo's veterinarian.  Mr. Coker avers that this statement was made during the September 9, 2009 meeting that Mr. Coker and Mr. Smith had with Drs. Ziegerer and Tims.  Neither Mr. Coker nor Mr. Smith could identify which inspector allegedly made the comment.  Viewed in the light most favorable to plaintiff, the evidence in the record is sufficient to permit a jury to disbelieve this reason.  To begin, this reason does not appear in the Notice of Discharge and, as such, it does not appear that the City relied upon this reason at the time it terminated plaintiff's employment.  More significantly, however, Dr. Ziegerer avers that "at no time" did she tell anyone employed by the City that plaintiff lacked compassion for animals or "any words to that effect."  She further avers that she does not recall Dr. Tims at any time telling anyone employed by the City that plaintiff lacked compassion for animals or any words to that effect.  Genuine disputes of fact, then, exist with respect to whether a USDA inspector told Mr. Coker that plaintiff lacked compassion for animals.

Finally, defendant contends that plaintiff was terminated, in addition to the reasons set forth above, for making a false statement to the USDA inspectors concerning the retention of expired medication due to budget constraints and for demonstrating a lack of professional

courtesy to the inspectors during the August 2009 inspection.  Other than a citation to the Notice of Discharge, however, defendant sets forth no evidence supporting these specific reasons.  The Notice of Discharge states  that plaintiff's "false statement" to USDA officials "that we were saving budget was not appropriate."  There is no evidence in the record as to how Mr. Coker learned about plaintiff's alleged statement or the basis for his asserted belief that she made such a statement.   There is no evidence that he accompanied the inspectors and plaintiff on the inspection such that he would have first-hand knowledge of the statement.  Mr. Coker does not aver or otherwise state anywhere that the inspectors communicated plaintiff's alleged statement to him.  The alleged statement does not appear in the inspection report or in the affidavits of the USDA inspectors.  Indeed, Dr. Ziergerer avers only that she asked Mr. Coker at some point after the inspection "if the expired drugs were being maintained due to budget limitations" and he replied that "budget was not an issue with regards to the drugs."  Dr. Ziegerer does not suggest that the budget idea came from plaintiff and no other evidence in the record points to plaintiff as the source of this statement.

The Notice of Discharge also states that plaintiff "demonstrated a lack of professional courtesy to the USDA inspectors: became argumentative with regard to the number of expired medications, refused to demonstrate capture equipment."  As with the alleged false statement, however, there is no independent evidence in the record supporting this assertion.  Mr. Coker was not present during the inspection itself and he does not indicate anywhere in the record how he came to learn about plaintiff's allegedly unprofessional conduct.  The affidavits of the inspectors do not suggest that plaintiff was unprofessional in any respect and do not state that

she refused to demonstrate equipment or was argumentative about the expired medications. There is no testimony in the record from the employees who accompanied plaintiff on the August 2009 inspection, Merle Miller and Fawn Moser.

Defendant's lack of evidence concerning the alleged false statement and lack of professional courtesy casts some doubt on these reasons. While plaintiff's pretext evidence as to these two reasons may not be particularly compelling, her burden with respect to these reasons is not a high one because plaintiff has come forward with ample evidence of pretext concerning the other reasons proffered by defendant–reasons upon which defendant relies much more heavily than it does on the alleged false statement and lack of professional courtesy. *See Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1126 (10th Cir. 2005) ("when the employer casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility. Under those circumstances, the jury need not believe the employer's remaining reasons.").

For the foregoing reasons, a reasonable jury could conclude that defendant's proffered reasons are unworthy of belief and plaintiff survives defendant's motion for summary judgment on these issues.

## IV.    Municipal Liability

In order for municipal liability to arise under §§ 1981 and 1983, plaintiff must demonstrate that the City's officials acted pursuant to a "policy or custom" of discriminatory employment practices. *See Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir.

2008). "An unconstitutional deprivation is caused by a municipal 'policy' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." *Id*. at 1274 (quoting *Marshall v. Columbia Lea Reg'l Hosp*., 345 F.3d 1157, 1177 (10th Cir. 2003)). Plaintiff has neither alleged nor produced any evidence suggesting that the discrimination she allegedly suffered was caused by any legislative action or any "an official whose acts may fairly be said to be those of the municipality itself." *See id.* Indeed, the pretrial order expressly states that plaintiff is not relying on any purported policy to establish a claim for municipal liability. To survive summary judgment on her §§ 1981 and 1983 claims, then, plaintiff must produce evidence that the discrimination was the result of a municipal custom. *See id.*

A "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Id*. (quoting *Marshall*, 345 F.3d at 1177). "In order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'" *Id*. (quoting *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993)). In attempting to prove the existence of such a "continuing, persistent and widespread" custom, "plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id*. Indeed, a plaintiff's "failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices." *Id*. (quoting *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995)).

19

Plaintiff does not allege that the City has a custom of discriminating against individuals in her protected classes and she does not allege that similarly situated individuals were mistreated. In fact, the only instance of discrimination identified by plaintiff is her own discharge. This limitation is fatal to her claim for municipal liability under *Randle*. In *Randle*, the Tenth Circuit affirmed the district court's conclusion that the plaintiff had failed to establish a genuine dispute of material fact about whether the City had a custom of discriminatory employment practices because the plaintiff had identified only a few incidents of discrimination, all of which were directed against her. *Randle*, 69 F.3d at 447. Discrimination cannot conceivably be the City's "standard operating procedure" based on one incident of discrimination. *See id.*; see also *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988) (plurality opinion) (custom requires that the illegal practice be "widespread"–*i.e.*, involving a "series of decisions"). In attempting to establish the existence of a custom of discrimination, plaintiff points to evidence of a "custom" of not taking adverse actions against non-foreign born, Caucasian employees for USDA violations. But the plaintiff in *Randle* had evidence that other employees were treated more favorably and, in the absence of evidence of discrimination against individuals in the same protected category, the Circuit concluded that no custom existed. *See id.*

Because plaintiff cannot sustain a claim for municipal liability, the court grants summary judgment in favor of defendant on plaintiff's §§ 1981 and 1983 claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for

summary judgment (doc. 118) is **granted in part and denied in part**.

**IT IS SO ORDERED.**

Dated this 29th  day of May, 2012, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge